# IN THE COURT OF APPEALS OF IOWA

No. 20-1661
Filed April 14, 2021

**IN THE INTEREST OF L.C.-M.,**
**Minor Child,**

**M.M., Mother,**
     Appellant.
_____

Appeal from the Iowa District Court for Woodbury County, Mark C. Cord III, District Associate Judge.

A mother appeals the termination of her parental rights.  **AFFIRMED.**

Theresa Rachel of Fankhauser, Farrens & Rachel, PLC, Sioux City, for appellant mother.

Thomas J. Miller, Attorney General, and Chandlor G. Collins, Assistant Attorney General, for appellee State.

Matthew R. Metzgar of Widdison Law Firm, Sioux City, attorney and guardian ad litem for minor child.

Kaitlin Boettcher, Sioux City, guardian ad litem for appellant mother.

Considered by Vaitheswaran, P.J., Ahlers, J., and Gamble, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2021).

**GAMBLE, Senior Judge.**

A mother appeals the termination of her parental rights to her child, L.C.M.[1] She (1) challenges the statutory ground authorizing termination, (2) claims termination is not in L.C.M.'s best interest, and (3) argues she should be given additional time to work toward reunification.[2]

**I. Scope and Standard of Review**

We review termination proceedings de novo. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). "We give weight to the factual determinations of the juvenile court but we are not bound by them. Grounds for termination must be proven by clear and convincing evidence. Our primary concern is the best interests of the child." *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006) (citations omitted).

We use a three-step process to review the termination of a parent's rights. *In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018). First, we determine whether a ground for termination under section 232.116(1) has been established. *See id.* at 472–73. If a ground for termination has been established, then we consider "whether the best-interest framework as laid out in section 232.116(2) supports the termination of parental rights." *Id.* at 473 (citation omitted). Then we consider "whether any exceptions in section 232.116(3) apply to preclude termination of parental rights." *Id.* (quoting *In re M.W.*, 876 N.W.2d 212, 220 (Iowa 2016)).

---

[1] The juvenile court also terminated the father's parental rights, but he does not appeal.

[2] To the extent to mother attempts to challenge the reasonable-efforts mandate, we find her argument not sufficiently developed for our review. *See In re B.T.*, No. 20-0768, 2020 WL 4812662, at *2 n.2 (Iowa Ct. App. Aug. 19, 2020); *In re K.M.*, No. 19-1637, 2020 WL 110408, at *3 n.6 (Iowa Ct. App. Jan. 9, 2020); *In re O.B.*, No. 18-1971, 2019 WL 1294456, at *2 (Iowa Ct. App. Mar. 20, 2019).

"However, if a parent does not challenge a step in our analysis, we need not address it." *In re J.P.*, No. 19-1633, 2020 WL 110425, at *1 (Iowa Ct. App. Jan. 9, 2020). Following our three-step process, we consider any additional claims brought by the parent. *See In re T.P.*, No. 19-0162, 2019 WL 3317346, at *2 (Iowa Ct. App. July 24, 2019).

## II. Discussion

### A. Statutory Grounds

We first address the mother's challenge to the statutory grounds authorizing termination. Here, the court terminated her parental rights pursuant to Iowa Code section 232.116(1)(h) (2020). Section 232.116(1)(h) authorizes termination of a parent's parental rights when:

> (1) The child is three years of age or younger.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

The mother only challenges the fourth element: whether the child could safely be returned to her care. Upon our de novo review of the record, we find the child could not be safely returned to the mother's care.

As a preliminary matter, we would be remiss if we did not recognize the effort the mother has displayed in attempting to prepare for reunification with her daughter despite an intellectual disability. As the State's attorney stated, "[E]verybody likes [the mother]. She's a very, very likable person and she has

made great strides." She obtained safe and suitable housing for herself and the child. She maintained employment and became financially stable. She was receptive to supportive services. Supervised visitation with the child went well, although the mother was unable to move to semi-supervised and unsupervised visitation. However, two issues remain: domestic abuse and the ability of the mother to care for the child.

One of the driving concerns in this case has been domestic violence and abuse between the mother and father. The father pulled the mother's arm, kicked her in the stomach while she was pregnant with L.C.M., punched her, and "start[ed] doing all the bad things."[3] In another instance, the father, while holding L.C.M., kicked the mother in the abdomen. So the court entered a no-contact order prohibiting the father from having any contact with the mother and L.C.M. The parents continued to have contact despite the no-contact order. During one encounter, the father threatened to kill the mother if she "had another man." In fact, the mother testified that during this encounter, the father never abused her even though she admitted he threatened to kill her. Despite the mother's admissions that domestic abuse occurred, we find the mother does not fully appreciate the father presents a danger to her.

The father is currently incarcerated, and the mother sends him money.[4] Like the caseworker assigned to this family, we believe the mother's continued

---

[3] After admitting the father physically abused her, the mother again denied the father ever hurt her.

[4] The mother first testified she was sending the father's brother's money. But later she admitted it was her money. The mother has a conservator who pays her bills and provides the mother with $85 in spending money per month.

financial support of the father indicates she intends to continue a relationship with him following his release from prison. Moreover, the mother accepts his calls from prison every week when he asks for money from her disability benefits. This is of grave concern. Our concern is compounded by the mother's testimony that she wants to try to be a family with the father.[5] The mother admits she would like to have a relationship with the father if he would attend mental-health treatment, anger management, domestic-abuse classes, and family classes to be a dad. But she also admits she would have no control over that.

And when asked how witnessing domestic violence would impact L.C.M., the mother could not provide an answer, responding: "Give me an option. Tell me." After some prompting, the mother agreed it would hurt the child to watch her dad hurt her mom. Viewing the mother's testimony as a whole, we believe the mother does not understand the full dangers of L.C.M. witnessing domestic abuse.

In her petition on appeal, the mother argues "[i]t was error for the [c]ourt to suggest" the mother "was required to completely 'cut' [the] father out of her life." Because the parents' relationship is riddled with domestic violence and abuse, we strongly disagree. The mother's ongoing relationship with the father, her domestic abuser, creates an inherent risk of harm to L.C.M. *See In re T.S.*, 868 N.W.2d 425, 435 (Iowa Ct. App. 2015) (concluding a child could not be returned to a mother when the mother had gained little insight into domestic violence and the danger it poses to children); *see also In re B.S.*, No. 20-1463, 2021 WL 609093, at *1 (Iowa Ct. App. Feb. 17, 2021) (finding children could not be returned to the mother

---

[5] The father also testified that he "would like to get back to her. [He] would like to be with her as a family."

because she continued to have a relationship with the abusive father). So it is not possible for the mother to maintain a relationship with the father and provide L.C.M. a safe home at the same time.

Additionally, the mother struggles to provide adequate care and supervision as a result of her cognitive impairment. The family caseworker stated the mother "struggles to anticipate safety issues for [L.C.M]." On one occasion, the mother permitted L.C.M. to bite off half a cheese stick and bounce on a bouncy horse, while the large portion of cheese stick was still in her mouth. The mother did not recognize this presented a choking hazard for young L.C.M. and had to be reminded by the visitation supervisor. The caseworker referenced this event to highlight the mother's inability to spot safety concerns by taking what she has learned and applying those teachings beyond any direct instruction she received. The caseworker explained,

> It just seems like it's an ongoing concern that she doesn't necessarily carry over from one thing to another, where you say you got to cut up every grape, she may cut up every grape moving forward, but she doesn't move that over to other foods that could also be a choking hazard or to small items in the house that could be a choking hazard.

The mother admitted she sometimes cannot read medicine bottles. So we have some concern about whether the mother would give L.C.M. the correct dosage of medication without direct instruction from someone else. And when asked what she would do if L.C.M. fell down and started to bleed, the mother indicated she would use "alcohol that takes the pain of blood away" and bandage the wound with a Band-Aid or wrap it up. If that did not work, she stated she would use a bigger Band-Aid and treat the wound with "lemon with salt." This leads us to question whether the mother could provide L.C.M. with basic first aid.

Because we believe the mother will continue her domestically abusive relationship with the father and conclude the mother cannot provide adequate care and supervision, we find L.C.M. could not be safely returned to the mother. The first step in our process in satisfied, so we move to our second step.

**B. Best Interest**

Next, we consider whether termination is in L.C.M.'s best interest. In considering the best interest of L.C.M., we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." *See P.L.*, 778 N.W.2d at 40 (quoting Iowa Code § 232.116(2)). "It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *Id.* at 41.

We agree with the juvenile court that L.C.M.'s best interests require termination. We look to the past for clues of what we may expect in the future. *Cf. In re C.K.*, 558 N.W.2d 170, 172 (Iowa 1997). While in the mother's care, L.C.M. lagged behind developmentally, but subsequent testing of L.C.M. after she was placed with a relative for a period of time showed L.C.M. had overcome her developmental deficits. This leads us to believe the mother was not adequately fostering L.C.M.'s development, and we fear this would continue in the future. So we think termination, which would free L.C.M. up for adoption into a home that can better serve her needs, is in L.C.M.'s best interest.

The second step in our process is satisfied. We move to the third.

### C. Exceptions to Termination

For our third step, we consider whether we should apply any of the Iowa Code section 232.116(3) exceptions to preclude termination. However, the mother does ask us to apply an exception. So we do not consider this step and instead move on to the mother's final claim.

### D. Additional Time

Finally, the mother requests additional time to work toward reunification.[6] The juvenile court may defer termination for a period of six months if it is able to "enumerate the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period." Iowa Code § 232.104(2)(b). In doing so, the juvenile court essentially must "predict what the future holds for [the mother]." *See In re A.M.*, No. 20-1378, 2021 WL 377103, at *3 (Iowa Ct. App. Feb. 3, 2021).

The mother argues not much will change for L.C.M. regardless of whether she is given additional time to work toward reunification or not, so we should go ahead and give her additional time. However, that is not a factor we consider when determining whether additional time should be granted. And the mother does not point to any "specific factors, conditions, or expected behavioral changes" that mean the need for L.C.M.'s removal will no longer exist if she is given additional

---

[6] The mother couched this claim within her challenges to the statutory grounds authorizing termination and the best-interest determination. However, we treat whether to grant a parent additional time to work toward reunification as a distinct issue.

time to work toward reunification.  *See* Iowa Code § 232.104(2)(b).  So we do not grant her additional time to work toward reunification.

**III. Conclusion**

L.C.M. could not be safely returned to the mother's care, so the statutory ground authorizing termination is satisfied.  And termination is in L.C.M.'s best interest.  The mother should not be given additional time to work toward reunification.  Therefore, we affirm the termination of the mother's parental rights to L.C.M.

**AFFIRMED.**